## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION AT LAFAYETTE

| | |
|---|---|
| GERALD ROBERTS, JR. and ) | |
| THERESA ROBERTS, ) | |
|     Plaintiffs, ) | |
| ) | |
| v. ) | CAUSE NO.: 4:09-CV-59-PRC |
| ) | |
| MENARD, INC. and MID-SOUTH METAL ) | |
| PRODUCTS, INC. d/b/a VERSATUBE ) | |
| BUILDING SYSTEMS, ) | |
|     Defendants. ) | |

## OPINION AND ORDER

This matter is before the Court on (1) a Motion for Summary Judgment of Menard, Inc. [DE 35], filed on November 1, 2010; (2) a Motion for Summary Judgment of Mid-South Metal Products, Inc. [DE 38], filed on November 1, 2010; (3) a Motion of Menard, Inc. and Mid-South Metal Products, Inc. to Exclude Evidence and Testimony of Fereydoun Aghazadeh [DE 40], filed on November 1, 2010; and (4) a Motion for Oral Argument [DE 58], filed by Plaintiffs on December 30, 2010.

On August 11, 2007, Plaintiff Gerald Roberts, Jr. was exiting the Menard store parking lot in Lafayette, Indiana, on his motorcycle when he left the traveling lane and drove his motorcycle into and through a shopping cart corral. At the far end of the cart corral, Mr. Roberts' motorcycle windshield hit a horizontal bar attached to the cart corral, and Mr. Roberts suffered severe physical injuries as a result of the incident. Mr. Roberts brings this lawsuit alleging premises liability against Menard, Inc. ("Menard"), the property owner, assembler, and installer of the cart corral, and alleging products liability against Mid-South Metal Products, Inc. d/b/a Versatube Building Systems ("Mid-South"), the manufacturer of the cart corral components.

## PROCEDURAL BACKGROUND

Plaintiffs Gerald Roberts, Jr. and Theresa Roberts filed a Complaint on August 7, 2009, in the Tippecanoe Superior Court II against Menard and Mid-South. On Defendant Menard's Notice of

Removal, the case was removed to this Court on August 31, 2009. Defendants filed the instant motions on November 1, 2010. Plaintiffs filed responses in opposition to all three motions on December 27, 2010. Defendants filed a reply in support of the Motion to Exclude Evidence on January 3, 2011, and filed replies in support of their Motions for Summary Judgment on January 10, 2011. On December 30, 2010, Plaintiffs filed a Motion for Oral Argument.

The parties orally agreed on the record to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## MOTION TO STRIKE

Plaintiffs retained Dr. Fereydoun "Fred" Aghazadeh as an expert witness in the areas of human factors/ergonomics engineering and safety engineering. Dr. Aghazadeh authored a report in this case on July 15, 2010, concluding that the cart corral into which Mr. Roberts drove his motorcycle and then crashed was unreasonably dangerous, that it was reasonably foreseeable that customers would walk, pass, or ride through the corral, and that the accident could have been prevented by various simple design and/or installation changes. On July 28, 2010, counsel for Plaintiffs served defense counsel with a Disclosure of Liability Expert Witness, which included the report and resume of Dr. Aghazadeh. On December 21, 2010, Dr. Aghazadeh executed an affidavit setting forth his expert conclusions stated above in more detail, including that "it was reasonably foreseeable . . . that customers would attempt to walk, pass, run, skateboard, rollerblade or ride motorcycles or bicycles through a cart corral." Pl. Br., Exh. 3, p. 3-4, 8. In the instant Motion to Strike, Defendants ask the Court to exclude the report and any expert testimony of Dr. Aghazadeh as unsupported by fact, unreliable, and unhelpful to the jury.

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the standards set forth by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Under Rule 702, "[t]he district court is a 'gatekeeper' who determines whether proffered expert testimony is reliable and relevant before accepting a witness as an expert." *Winters v. Fru-Con Inc.*, 498 F.3d 734, 741-52 (7th Cir. 2007) (discussing a "human factors" expert) (quoting *Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 749 (7th Cir. 2006)).

A three-step analysis is utilized to determine the admissibility of expert testimony under this rule. *See Ervin*, 492 F.3d at 904. First, "the witness must be qualified 'as an expert by knowledge, skill, experience, training, or education.'" *Id*. (quoting Fed. R. Civ. P. 702). Second, "the expert's reasoning or methodology underlying the testimony must be scientifically reliable." *Id*. (citing *Daubert*, 509 U.S. at 592-93). Finally, the expert's testimony must be relevant or "assist the trier of fact to understand the evidence or to determine a fact in issue." *Id*. The proponent of the expert testimony–Plaintiffs in this case–bears the burden of proof with respect to whether the admissibility requirements of *Daubert* are met. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

First, the Court considers Dr. Aghazadeh's qualifications to reach the opinions given in this case. Although Defendants rightly do not object to Dr. Aghazadeh's extensive qualifications as an

expert in human factors analysis, they do argue that his area of specific expertise does not qualify him to provide testimony regarding the circumstances of this case.

A careful review of Dr. Aghazadeh's extensive curriculum vitae reveals no publications, speaking engagements, conferences, or training related to consumer expectations in general, related more specifically to consumer expectations in a parking lot or regarding cart corrals in parking lots, related to the behavior of motorcyclists or motorcyclists in parking lots, or related to any other area of human factors engineering relevant to the incident at issue in this case, namely a customer driving his motorcycle through a cart corral in a parking lot. The overwhelming majority of Dr. Aghazadeh's publications appear to relate to workplace safety and ergonomics issues regarding employees.[1] Of his approximately 80 publications, only one article (accepted for publication but not yet published), entitled "Effect of Distraction on Visual Behavior and Driving Performance: An Eye Movement Tracking Approach," appears even tangentially related to this incident. Similarly, of the 63 "presentations" and of the 50 "refereed conference proceedings" (over half of which are also included on the "presentations" list), only the presentation entitled "Observation of Driver Response Patterns in Car Following" in 2004 for the International Annual Occupational Ergonomics and Safety Conference, appears tangentially related.

---

[1] A sampling of the titles of his publications include, "Neck Disorders: Understanding the Physical Loads on the Cervical Spine during Static Lifting Tasks," "Safety Training Issues for Hispanic Construction Workers," "Understanding the Effect of Speed of Exertion on the Isokinetic Strength Using a Multiaxial Dynamometer," "Major Factors Influencing Productivity of Water and Wastewater Treatment Plant Construction: Evidence from the Deep South USA," "Effect of Pressure Suit on Functional Reach," "Comparison of Current U.S. and Canadian Cigarette Pack Warnings," "Effect of Complex Aural Stimuli on Mental Performance," "Stair Riser Height and the Impact Force," "Work-Rest Schedule for Data Entry Operators," "A Design and Selection Guide for Hand Held Tools," "Anthropometric and Lifting Load Capacity Measurement of Indonesian Workers," "The Effect of High Heels on Lifting Capacity," "Survey of Robot Safety in Industry," "A New Method for Screening Low Back Injuries and Malingerers," "Back Problems Affecting Preschool Special Education Staff," "Ergonomics of the Farm Tractor," "Safety Problems in the Oil and Gas Extracting Industry," "Effect of Gender on Physical Work Capacity and Strength," and "Prediction Models for Manual Handling of Bags." The titles of the listed conference proceedings are similar in nature.

4

Dr. Aghazadeh's areas of teaching and research include ergonomics and ergonomics/human factors engineering, safety engineering, occupational safety and health, industrial hygiene, traditional industrial engineering, work physiology, anthropometry and workplace design, occupational biomechanics, and work analysis and design. His published books are as the editor of "Advances in Industrial Ergonomics and Safety" and "Trends in Ergonomics/Human Factors V." Of the 29 listed "research reports, book reviews, abstracts, and other publications," none addresses topics related to the circumstances or issues in this case.

In his Affidavit, Dr. Aghazadeh represents that he has "been accepted in state and federal courts as an expert in the areas of Ergonomics/Human Factors Engineering, Safety Engineering, and Industrial Engineering, including the United States District Court for the Eastern District of Louisiana and the United States District Court for the Western District of Louisiana." Pl. Br., Exh. C, p. 2. However, he does not identify the cases in which he served as an expert nor does he describe the subject matter of those cases, offering no information that would demonstrate prior testimony or experience related to the areas at issue in this case. Similarly, his Curriculum Vitae does not list serving as a retained expert under "other revenue generating activities" and does not mention any cases in which he has served as an expert.

Dr. Aghazadeh explains in his Affidavit that "Human Factors/Ergonomics Engineering is that field of expertise which is involved in conducting research regarding human psychological, social, physical, and biological characteristics, maintaining the information obtained from that research, and working to apply that information with respect to the design, operation, or use of products, premises or systems for optimizing human performance, health, safety, and habitability." Pl. Br., Exh. C, p. 2. However, neither his report nor his Affidavit explains how Dr. Aghazadeh's training or expertise makes him knowledgeable about the matters in this case. Nothing in his credentials shows that Dr.

Aghazadeh has expertise or qualifications in parking lot layouts or planning; consumer expectations, behavior, and use in parking lots; construction, design, use, or placement of cart corrals or other fixtures or apparatus in parking lots; vehicle use in parking lots; vehicle driver behavior in parking lots; or, more relevantly, motorcycle driver behavior in general or in more specifically in parking lots.

Therefore, although Dr. Aghazadeh may be a human factors expert as it relates to his developed areas of expertise, there is no evidence of knowledge, skill, experience, training, or education such that he is qualified to testify regarding consumer expectations or any other area related to an incident of a customer choosing to drive a motorcycle through a cart corral in a parking lot. Based on the evidence before the Court, because Dr. Aghazadeh lacks any discernable expertise in the matters directly related to the issues in this case, namely consumer/motorist expectations in a parking lot or cart corral design for consumer use in a parking lot, he is not qualified to testify as an expert in this case.

The Court also considers Defendants' objection to the reliability of Dr. Aghazadeh's method. *Daubert* lists several relevant considerations for evaluating an expert's reasoning and methodology, including testing, peer review, error rates, and acceptability in the relevant scientific community. *Daubert*, 509 U.S. at 593-94. This is not a rigid check list; rather, the test of reliability is "flexible," and "*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (internal quotation marks omitted). A district court is granted "broad latitude when it decides how to determine reliability." *Kumho*, 526 U.S. at 142.

To reach his opinions, Dr. Aghazadeh considered eight depositions taken in this case; Plaintiffs' Complaint; Defendants' answers to interrogatories and responses to requests for production of documents; a DVD containing a video of the parking lot taken on March 26, 2010; various

photographs of the scene of the incident, the parking lot, and the cart corral; various technical drawings of the cart corral; and his personal observation of various cart corrals. From his review of these materials, he concluded that "it was reasonably forseeable, prior to and on the date of the incident, to Menard[] and [Mid-South] that people would walk, run, skateboard, rollerblade or ride motorcycles or bicycles through the cart corrals on the Menard[], Inc. parking lot;" that the "incident was caused by an unreasonably dangerous condition on Mendard[], Inc.'s parking lot and an unreasonably dangerous Cart Corral specified by Mendard[], Inc., and designed and manufactured by [Mid-South];" that "[t]he Cart Corral was unreasonably dangerous in design due to lack of proper warnings and installation;" and that the "incident could have been prevented by various simple designs, warning and/or installation changes, which were technically and economically feasible." Pl. Br., Exh. C, p. 8-9, ¶ 9(q).

Although the materials he reviewed provided Dr. Aghazadeh with some necessary underlying facts, he did not reenact the incident nor did he perform testing of either the conditions of the incident or alternative designs. He does not identify reliance on any studies or reports related to parking lots, parking lot incidents or accidents, consumer injuries, motorcycle use, motorcycle injuries, or other subjects that would support his opinions. Dr. Aghazadeh has offered no data, results of alternative testing, forensic studies, or other empirical data or information other than his own opinion based on his knowledge that Mr. Roberts was, in fact, injured in the cart corral to support his opinions regarding the design of the corral, its condition, and alternative design changes. Dr. Aghazadeh makes several suggestions regarding design changes to the cart corral at issue without any verification that those alternative designs would have been more effective in preventing Mr. Roberts from attempting to drive his motorcycle through the cart corral.

The Seventh Circuit Court of Appeals has noted that, in alternative design cases, the Court has "'consistently recognized the importance of testing the alternative design' as a factor that the district court should consider in evaluating the reliability of the proposed expert testimony." *Winters*, 498 F.3d at 742 (discussing a "human factors" expert) (quoting *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 869 (7th Cir. 2001)). The *Winters* court explained that, although not mandated, when an alternative design is proposed but not tested, opinions premised on the fact that the current design may have resulted in injury may be insufficient. *Id*. at 742-43. Specifically, the Court reasoned:

> The appropriateness of the proposed expert's methodology is a question for the district court in its role as a gate-keeper. An expert must substantiate his opinion; providing only an ultimate conclusion with no analysis is meaningless.
>
> The district court properly exercised its discretion in finding that Winters' proposed experts were not reliable and therefore properly rejected their tendered expert testimony. The proposed experts both failed to test their alternative designs and also failed to utilize any other method of research to compensate for their lack of alternative testing. Thus, their proposed opinion is based on a belief that alteration to add a safety improvement is appropriate and therefore there is no need to determine the reliability of their alternatives. Simply put, an expert does not assist the trier of fact in determining whether a product failed if he starts his analysis based upon the assumption that the product failed (the very question that he was called upon to resolve).

*Id*. at 743 (internal citations and quotation marks omitted).

In this case, Dr. Aghazadeh proposes several alternative designs for the cart corral, all of which are predicated, in hindsight, on the fact of Mr. Roberts' injuries and the assumption that the cart corral failed. In other words, Dr. Aghazadeh assumes that the cart corral failed and then retrospectively opined regarding other safety designs he believes may have been feasible. However, none of the designs were tested by Dr. Aghazadeh, and he has not offered any analysis of factual data regarding these alleged safety features. Dr. Aghazadeh does not bridge the "analytical gap" between his review of the facts and his conclusions. *See, e.g.*, *Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 536 (7th Cir. 2005), *rev'd on other grounds* by *Fuesting v. Zimmer, Inc.*, 448 F.3d 936 (7th Cir. 2006). As a consequence,

the speculative opinions that there was an unreasonably dangerous condition on the parking lot, that the cart corral was unreasonably dangerous, and that the incident could have been prevented by alternate designs or warnings are not reliable.

Dr. Aghazadeh's opinions regarding reasonable consumer behavior while driving a motorcycle through a parking lot are also unreliable. Without substantiation by any published study, data, observation, or other fact, Dr. Aghazadeh claims that consumers in a parking lot would "attempt to walk, pass, run, skateboard, rollerblade or ride motorcycles or bicycles through a cart corral." Pl. Br., Exh. C, p. 3, ¶ 9(c) (Affidavit of Dr. Aghazadeh). He then opines, without any reference to published data, research, or testing, that motorcycle operators would be "attracted to the cart corral because it looks like a tunnel." *Id*. at p. 4, ¶ 9(d). He also states, without any reference to data, testing, publications, or other research, that motorcyclists would likely attempt to pass through the cart corral because it "looks like a carport," which would "elicit curiosity from persons on the parking lot." *Id*. at ¶ 9(e). Dr. Aghazadeh also provides testimony, without reference to facts, data, research, or testing, about what reasonable motorcyclists in a parking lot would do regarding the cart corral, going so far as to reference Mr. Roberts' presumed subconscious memory and experiences without any testimony or evidence on that topic. These unsubstantiated opinions render Dr. Aghazadeh's Affidavit and testimony unreliable.

Based on the foregoing, the Court grants the Motion to Strike and orders that the opinions, reports, and testimony of Dr. Aghazadeh are excluded from evidence in this matter.

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further requires the entry of summary

judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323; *see also* Fed. R. Civ. P. 56(c). The moving party may discharge its "initial responsibility" by simply "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325; *see also* Fed. R. Civ. P. 56(c). When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Celotex*, 477 U.S. at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chi.*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists. *See Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See* Fed. R. Civ. P. 56(e)(2); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Rule 56(e) provides that, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion . . . [or] grant summary judgment if the motion and supporting materials–including the facts considered undisputed–show that the movant is entitled to it . . . ." Fed. R. Civ. P. 56(e)(2), (3); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *See Anderson*, 477 U.S. at 255; *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *See Anderson*, 477 U.S. at 249-50; *Doe*, 42 F.3d at 443.

## MATERIAL FACTS

On August 11, 2007, Plaintiff Gerald Roberts and his friend H.E. Smith rode their motorcycles to the Menard store in Lafayette, Indiana. They parked their motorcycles under the canopy outside the front entrance and entered the store as customers. After leaving the store, Mr. Roberts and Mr.

Smith returned to their parked motorcycles and began to exit the parking lot. As they were leaving, Mr. Roberts, who was following Mr. Smith, drove his motorcycle into and through a cart corral that was positioned at an angle in the parking lot. At the far end of the cart corral, Mr. Roberts' motorcycle windshield hit a horizontal bar attached to the car corral and then Mr. Roberts hit the bar. Mr. Smith had remained in the traveling lane of the parking lot and did not enter the cart corral.

According to Phil Ladd, the only eyewitness to the incident and a motorcycle rider himself, Mr. Roberts was traveling at a speed of nearly 30 miles per hour when he entered the cart corral. Mr. Ladd testified that Mr. Roberts came "flying down this road, and shot right through that cart corral." Pl. Br., Exh. C, p. 9-10. Mr. Smith testified that Mr. Roberts stayed on his motorcycle after it hit the horizontal bar and that after Mr. Roberts and the bike went under the bar and came to a stop, the motorcycle was on top of Mr. Roberts. Both Mr. Ladd and Mr. Smith testified that they lifted the motorcycle off of Mr. Roberts.

Investigating officer Timothy Bonner concluded that Mr. Roberts was traveling at a low rate of speed, approximately five miles per hour. Officer Bonner did not interview Mr. Ladd. Officer Bonner concluded that the horizontal bar had knocked Mr. Roberts off the motorcycle, the motorcycle went over on its side, and came to rest very rapidly. Officer Bonner testified that it is fairly common for people to drive across parking columns painted on a parking lot when exiting the parking lot.

Mr. Roberts was bruised badly across the front of the neck under the jaw immediately following the crash. As a result of the incident, Mr. Roberts sustained a closed head injury consisting of frontal lobe brain damage. He suffered spontaneous strokes throughout his brain, which affected nearly all of his bodily functions. Mr. Roberts' injuries from the incident have necessitated home health care, and Mr. Roberts is generally limited to a wheelchair and is unable to take care of his

personal needs.  Mr. Roberts has no recollection of the accident or of even having been at the Menard

store on that date.

The cart corral at issue in this litigation is one of four cart corrals then on the Menard premises

in Lafayette.  The cart corral involved in this incident had a horizontal metal bar attached across the

end of the corral farthest from the traveling lane of the parking lot.  The horizontal bar was installed,

and existed on the date of the incident, at forty-six inches above the ground.  The horizontal bar was

not painted with a safety color or reflective paint.  The cart corral was covered with paneling over the

top of the corral and half-way down its sides.  A sign on the paneling contained the words "Cart

Corral."  The paneling came down low enough to prevent the horizontal end bar from being seen from

the side.  There were no warning signs or markings indicating the location of the horizontal bar.

The corral was completely located in a parking space immediately adjacent to the travel lane

in which he and Mr. Smith were driving.  No portion of the corral was in the travel lane.  Yellow

painted lines surround the corral.  The parking spot adjacent to the far end of the corral where the

horizontal bar exists and which is located in the adjacent column of parking spaces is completely

striped through with yellow paint and contains the words "no parking."  The Menard printed

documentation provides that "Cart Corrals will have 'NO PARKING' stripes in front of the corrals,"

which means the "open" end of the corrals.  Pl. Br., Exh. 6.

There are three other cart corrals manufactured by Mid-South in the Menard parking lot at

issue.  On one or two prior occasions, Mr. Smith had traveled to the same Menard store on his

motorcycle and, for fun, rode his motorcycle through a cart corral that did not have a horizontal bar.

Mr. Smith believed that Mr. Roberts had been with him when he had done that but he was not sure.

A year earlier, Mr. Roberts and Mr. Smith had parked their motorcycles in one of the cart corrals

during a storm and had exited through the other side. Mr. Roberts testified that he had previously ridden through a cart corral that was "open and vacant." Pl. Br., Exh. 3, p. 20 (Roberts' deposition).[2]

Prior to the incident in this case, Menard had no knowledge of any motorist ever attempting to drive a motorcycle through a cart corral.

In 2001, Mid-South, a manufacturer of tubular steel framed products for structures, began making and selling the frames (but not the side panels) for cart corrals at the request of Menard, including the cart corral at issue in this case. The cart corrals were intended to be used as a place for customers to put shopping carts in the parking lot. Mid-South did not offer any advice or suggestions about how the cart corrals should be used.

The design of the corrals was requested by Menard. Mid-South then used a carport frame as the basis for the design. The cart corral was not designed for the possibility that people would attempt to pass through the corral from one end to the other. Mid-South manufactured, prepared directions for assembly, packaged, sold, and distributed the cart corral in question.

All of Mid-South's products are manufactured within international building code standards regarding wind load and life load in its structures. With respect to the cart corral at issue in this litigation, the unit provided by Mid-South exceeds the minimum and maximum load necessary. In other words, the frame of the cart corral should remain structurally intact for wind conditions if it is properly attached to the ground.

The corrals were assembled by employees of Menard. There are instructions from both Menard and Mid-South for assembly of the cart corral, which instruct that the horizontal bar be

---

[2] It is not clear from his deposition testimony whether he had previously ridden through the cart corrals at the Menard store at issue in this case.

14

installed at thirty-six inches above the ground. As the horizontal bar was installed at forty-six inches, it did not serve its intended purpose of keeping forty-inch tall shopping carts contained.

## ANALYSIS

### A. Motion for Summary Judgment of Menard, Inc.

In the Complaint, Plaintiffs allege that Menard breached its duty to maintain its premises in a safe and reasonable manner, including the parking lot and cart corrals and breached its duty to warn its guests of unsafe conditions on the premises, resulting in Mr. Roberts' injuries. Menard seeks summary judgment in its favor on the basis that Menard, as a landowner, did not breach its duty to Mr. Roberts as a licensee. Plaintiffs respond that Mr. Roberts was an invitee to whom Menard breached its duty and, even if he were a licensee at the time of the incident, Menard nevertheless breached its duty to Mr. Roberts.

To prevail on a claim for negligence, a plaintiff must establish that (1) the defendant owed a duty to the plaintiff, (2) the defendant breached that duty, and (3) the breach of duty proximately caused the injury to the plaintiff. *Harradon v. Schlamandinger*, 913 N.E.2d 297, 300 (Ind. Ct. App. 2009). In a premises liability case such as this, the plaintiff's status on the property of the defendant property owner dictates the level of duty owed to the plaintiff. *Kopczynski v. Barger*, 887 N.E.2d 928, 931 (Ind. 2008) (citing *Burrell v. Meads*, 569 N.E.2d 637, 639 (Ind. 1991)); *Harradon*, 913 N.E.2d at 300 (citing *Rhoades v. Heritage, Invs., LLC*, 839 N.E.2d 788, 791 (Ind. Ct. App. 2005)). Therefore, the first step in resolving a premises liability case is to determine the plaintiff's status as an invitee, licensee, or trespasser. *See Kopczynski*, 887 N.E.2d at 931; *Morningstar v. Maynard*, 798 N.E.2d 920, 922 (Ind. Ct. App. 2003).

In *Burrell*, the Indiana Supreme Court adopted the invitation test as the basis for determining who is an invitee, identifying the three classes of invitees as "public invitees," "businesses visitors,"

and "social guests." A "public invitee" is invited to enter or remain on land as a member of the public for a purpose for which the land is held open to the public. *Id.* at 642. A "business visitor" is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land. *Id.* A landowner owes to all invitees the highest duty of care, that is the "duty to exercise reasonable care for [the invitee's] protection while [the invitee] is on the landowner's premises." *Burrell*, 569 N.E.2d at 639.

Licensees and trespassers are those who enter premises for their own convenience, curiosity, or entertainment and take the premises as they find them. *Rider v. McCamment*, 938 N.E.2d 262, 267 (Ind. Ct. App. 2010) (citing *Taylor v. Duke*, 713 N.E.2d 877, 881 (Ind. Ct. App. 1999)). However, unlike trespassers, licensees have a privilege to enter or remain on the land by virtue of the landowner's or occupier's permission or sufferance. *Id.* (citing *Taylor*, 713 N.E.2d at 881). A landowner owes a licensee the duty to refrain from willfully or wantonly injuring the licensee or acting in a matter to increase the licensee's peril. *Taylor*, 713 N.E.2d at 881. This includes the duty to warn a licensee of any latent danger on the premises of which the landowner has knowledge. *Id.* The duty owed to a trespasser is the duty simply to refrain from wantonly or willfully injuring him after discovering his presence. *Id.*

Although summary judgment is rarely appropriate in negligence cases, when the question is one of the plaintiff's visitor status, the issue is a matter of law and is proper for summary judgment. *Morningstar*, 798 N.E.2d 922 (citing *Crossno v. State*, 726 N.E.2d 375, 381 (Ind. Ct. App. 2000); *Jump v. Bank of Versailles*, 586 N.E.2d 873, 875 (Ind. Ct. App. 1992)). This is not a case in which Mr. Roberts' status on the Menard property turns on factual issues that must be resolved by the trier of fact. *See, e.g.*, *Kopczynski*, 887 N.E.2d at 931; *Rhodes v. Wright*, 805 N.E.2d 382, 386 (Ind. 2004); *Yates v. Johnson County Bd. of Comm'rs*, 888 N.E.2d 842, 848, 851 (Ind. Ct. App. 2008).

Therefore, the Court must consider Mr. Roberts' status at the time of the incident. It is undisputed that Mr. Roberts entered the Menard premises as an invitee of Menard for the purpose of visiting the Menard store as a customer. Mr. Roberts and Mr. Smith parked their motorcycles under the canopy on the sidewalk located outside the store entrance, entered the store, shopped, exited the store, and returned to their parked motorcycles. At the time the incident occurred, Mr. Roberts and Mr. Smith were exiting the parking lot, a usual and normal activity expected of Menard customers or at least incidental to a customer's primary purpose of shopping in the store.

However, a person's status may change from that of invitee to that of licensee if the invitee exceeds the scope of the invitation. *Rider*, 938 N.E.2d at 267 (citing *Markle v. Hacienda Mexican Rest.*, 570 N.E.2d 969, 974 (Ind. Ct. App. 1991)). In other words, the status of an invitee "may change to that of a licensee while he is on the premises if the use to which he puts the property does not correspond to the owner's reason for holding the property open." *Markle*, 570 N.E.2d at 974 (citing *Hoosier Cardinal Corp. v. Brizius*, 199 N.E.2d 481 (1964); 62 Am. Jur. 2d Premises Liability §§ 105, 107 (1990)). This loss of status is explained:

> If an invitee on business or commercial premises does not use the premises in the usual, ordinary, and customary way contemplated for their use by the public, the invitee loses invitee status to the extent that the use the invitee makes of the premises results in injury to him or her or to property in his or her possession.
>
> The rule that a plaintiff must show that when he or she received the injury he or she was on a part of the premises which he or she was invited to use, and was using them in a manner authorized by the invitation, whether express or implied, is applied to the use of particular instrumentalities. An improper use of an appurtenance or instrumentality on the premises for a purpose for which it is not intended or designed is not contemplated by any implied invitation to use the premises. However, if more than one use is contemplated by the invitation, an invitee's status is unaffected by any use within its purview, or any closely related use to which the occupant does not object.

62 Am. Jur. 2d Premises Liability § 108 (2011).

In this case, Mr. Roberts exceeded the scope of Menard's invitation when he drove his motorcycle through the cart corral as a passageway or thoroughfare, which was not a purpose for which the cart corral was intended. The cart corral was intended to be used as a place for the collection and storage of shopping carts in the parking lot and was not designed for the possibility that people would attempt to pass through the corral from one end to the other. There is no evidence to suggest that the cart corral had any purpose or foreseeable purpose or use other than as a place to collect shopping carts. The cart corral was located entirely in a parking space. There is no evidence that the cart corral and its horizontal bar were in any way dangerous or unsafe when used for the intended purpose. There is no evidence that the cart corral contained any latent, concealed, or hidden defects. There is no evidence that the horizontal bar was not visible to a pedestrian returning a cart to the cart corral. A sign was attached to the side of the cart corral that read "Cart Corral." Although Mr. Smith and possibly Mr. Roberts had driven through a different cart corral in the Menard parking lot on a prior occasion, there is no evidence that the cart corrals were intended for that use.

The purpose and circumstances surrounding Menard's invitation to Mr. Roberts on the Menard premises, and more specifically in its parking lot, at the time of the incident was to exit the parking lot after completing his business in the store. Exiting the parking lot was within the scope of the invitation, and exiting the parking lot by cutting across unoccupied rows of parking spaces may also have been contemplated to be within the scope of the invitation. However, the focus here is not on the act of "exiting" but rather Mr. Roberts' improper use of an appurtenance on the property. There is nothing "usual and customary" about driving a motorcycle through a cart corral in a parking lot nor is a passageway for motorcyclists a normal use of the cart corral. *See Markle*, 570 N.E.2d at 975 (discussing *Silvestro v. Walz*, 51 N.E.2d 629 (Ind. 1943)). The invitation carried with it no

authorization or invitation by Menard to use the cart corral as a drive through or passageway for exiting the premises.

Arguing that driving through the cart corral was directly related to or incidental to exiting the parking lot, Plaintiffs note Menard's admission that motorcyclists, among others, *could* physically pass through an empty cart corral without a horizontal bar and that it is fairly common for people to drive across parking columns when exiting a parking lot. However, the mere fact that something *can* occur does not mean that the conduct is within the scope of the invitation extended by Menard as the business owner. It is also irrelevant whether people drive across parking columns when exiting a parking lot, as that is an inquiry distinct from whether a motorcyclist will drive through a cart corral in an attempt to leave a parking lot.

Although Menard must be aware of those activities that would be considered incidental to its customers' use of the parking lot, there is no evidence that driving motorcycles through cart corrals is an incidental use, that other individuals have been known to drive motorcycles through cart corrals, or that Menard was aware of Mr. Smith's and Mr. Roberts' prior usage or the potential for such usage. Prior to this incident, Menard had no knowledge of any motorist ever attempting to drive a motorcycle through a cart corral, and Menard was not aware that Mr. Smith and Mr. Roberts had driven through a cart corral on a prior occasion. Even though a certain percentage of shoppers may not observe all of the regulations of the business owner, it does not mean that those non-conforming uses amount to a use of the premises in the "usual, ordinary, and customary way" contemplated for the use by the public. *St. Mary Medical Ctr. of Evansville, Inc. v. Loomis*, 783 N.E.2d 274, 282 (Ind. Ct. App. 2002) (quoting *Markle*, 570 N.E.2d at 974). The Court finds as a matter of law that Mr. Roberts' use of the cart corral was an improper use of the corral and was not incidental to the invitation Menard made to its customers to travel through its parking lot.

This case is distinguishable from *Markle*, in which the court found that, although there was no genuine issue of material fact, a trier of fact could reach a conclusion contrary to the trial court as to whether the plaintiff's actions at the time he was injured were incidental to his reason for going to the restaurant, impacting his status as an invitee or a licensee at the time he was injured. 570 N.E.2d at 975. In *Markle*, the plaintiff stopped to eat at the defendant's restaurant. *Id*. at 971. As he arrived in the restaurant parking lot, he saw a friend/co-worker sitting in his truck in the parking lot, and the plaintiff pulled up next to him. While transferring a piece of sample steel from his vehicle to the truck of his friend/co-worker, the plaintiff stepped in a chuckhole and injured himself. *Id.* The trial court found, as a matter of law, that plaintiff's actions in moving the steel from his car to the friend/co-worker's truck was not merely incidental to his main purpose of entering the parking lot to eat at the restaurant, changing his status to that of a licensee. *Id*. at 975. The appellate court reversed, holding that, although it was undisputed that the plaintiff was an invitee when he first entered the parking lot with the intention to eat at the restaurant, there was a dispute as to his status at the time of his injury. *Id*. The court reasoned that, because the status inquiry was framed in terms of what could reasonably be expected to be within the scope of the invitation, under the circumstances of that case, what is considered "incidental" to a visit to a restaurant was properly left to the trier of fact. *Id*. There is no such open question for the trier of fact in this case.

Driving a motorcycle through the cart corral was not the "usual, ordinary, and customary way" of using the corral. By driving his motorcycle through the cart corral, Mr. Roberts used the cart corral for a purpose for which it was not intended and exceeded the scope of the invitation. Thus, Mr. Roberts' status on Menard's property at the time he was injured changed to that of a licensee.

Menard did not owe Mr. Roberts any duty of reasonable care as a licensee. As a licensee, Mr. Roberts took the premises as he found them, and Menard's duty to Mr. Roberts was to refrain from

willfully or wantonly injuring him or acting in a manner to increase his peril. This includes the duty to warn of any latent danger on the premises of which the landowner has knowledge. *Gilpin v. Ivy Tech State College*, 864 N.E.2d 399, 403 (Ind. Ct. App. 2007). A "latent" danger is defined as a danger that is "concealed or dormant." *Rhoades*, 839 N.E.2d at 794 (citing Black's Law Dictionary 898 (8th ed. 2004)). The condition of the cart corral in this case was not a latent danger. It was labeled on the side with a sign that read "Cart Corral." The horizontal metal bar that Mr. Roberts drove into was not hidden or concealed from plain view. The color photos patently reveal the existence of the bar. A customer returning a cart to the cart corral would have viewed the horizontal bar regardless of which end of the corral was used to return the cart. As the bar was not hidden or concealed, Menard did not have a duty to warn Mr. Roberts of its presence. Whether the bar was installed at the correct height and thus did not serve its original intended purpose of retaining shopping carts is irrelevant. Therefore, as a matter of law, Menard did not violate any duty owed to Mr. Roberts as a licensee.

Plaintiffs argue that a jury could conclude that Menard did not consider the safety of Mr. Roberts and other customers in installing the horizontal bar and, thus, breached their duty owed to Mr. Roberts by failing to refrain from willfully and wantonly injuring him. However, these claims are allegations of what Plaintiffs believe Menard should have done in the exercise of "reasonable care," which is not the standard of the duty owed to a licensee. For an action to be "willful" or "wanton," the course of action must show "an actual or deliberate intention to cause injury or which, under existing conditions, shows either an utter indifference or conscious disregard for the rights of others." *Coachmen Indus., Inc. v. Dunn*, 719 N.E.2d 1271, 1277 (Ind. Ct. App. 1999). There is no evidence of any such intention or conscious disregard for the safety of Menard's customers in relation to the

horizontal bar. The only intent expressed in the record regarding the placement of the bar is the intent to protect patrons' vehicles from being damaged by rolling carts.

Summary judgment is granted in favor of Menard on Plaintiffs' Complaint.

### B. Motion for Summary Judgment of Mid-South Metal Products

Plaintiffs' Complaint alleges that the cart corral manufactured by Mid-South was unreasonably dangerous in design and was unreasonably dangerous because of inadequate warnings of the dangerous conditions in the cart corral. Plaintiffs also allege that Mid-South failed to exercise reasonable care under the circumstances in manufacturing and placing the cart corral structure into the stream of commerce in a defective and unreasonably dangerous condition and by failing to provide adequate warnings regarding the use, installation, and condition of the cart corral.

These claims are governed by the Indiana Products Liability Act, which governs "all actions" that are brought by a user or consumer against a manufacturer or seller for physical harm caused by a product "regardless of the substantive legal theory or theories upon which the action is brought." Ind. Code § 34-20-1-1; *see also Cook v. Ford Motor Co.*, 913 N.E.2d 311, 319 (Ind. Ct. App. 2009). A plaintiff seeking to establish liability under the Act must prove that "(1) the product was defective and unreasonably dangerous; (2) the defective condition existed at the time the product left the defendant's control; and (3) the defective condition was the proximate cause of the plaintiff's injuries." *Deaton v. Robison*, 878 N.E.2d 499, 501 (Ind. Ct. App. 2007) (citing *Coffman v. PSI Energy, Inc.*, 815 N.E.2d 522, 527 (Ind. Ct. App. 2004), *trans. denied*). To qualify as "unreasonably dangerous," "the use of a product must expose a consumer to a risk of physical harm to an extent beyond that contemplated by an ordinary consumer with ordinary knowledge about a product's characteristics." *Id.* (citing Ind. Code § 34-6-2-146).

"[I]n an action based on an alleged design defect in the product or based on an alleged failure to provide adequate warnings or instructions regarding use of the product, the party making the claim must establish that the manufacturer or seller failed to exercise reasonable care under the circumstances in designing the product or in providing the warnings or instructions." Ind. Code § 34-20-2-2. "While a manufacturer is under no duty to produce accident proof products, it is legally bound to design and build products which are reasonably fit and safe for the purpose for which they are intended." *Guerrero v. Allison Engine Co.*, 725 N.E.2d 479, 482 (Ind. Ct. App. 2000) (internal quotation marks omitted) (quoting *Liberty Mut. Ins. Co. v. Rich Ladder Co., Inc.*, 441 N.E.2d 996, 999 (Ind. Ct. App. 1982)). Under the Act, "[a] product is in a defective condition . . . [if] it is in a condition: (1) not contemplated by reasonable persons among those considered expected users or consumers of the product; and (2) that will be unreasonably dangerous to the expected user or consumer when used in reasonably expected ways of handling or consumption." Ind. Code § 34-20-4-1.

There is no evidence that the unassembled cart corral frame, as supplied by Mid-South, was in a dangerous or defective condition. Rather, the evidence is undisputed that the unassembled corral frame left the possession of Mid-South in the proper and non-dangerous condition. There is no evidence to suggest that the unassembled cart corral frame provided by Mid-South exposed anyone to a risk of physical harm above and beyond any ordinary consumer who uses a cart corral.

Nor was the cart corral dangerous or defective as assembled. Mr. Roberts was injured as a result of using the cart corral in a manner for a purpose *not* foreseeable to Mid-South. There is no evidence that the cart corral was in a condition "not contemplated by reasonable . . . expected users or consumers" as required by § 34-20-4-1. The cart corral was intended to be used as a place for the storage of carts in the parking lot. It was functional for that purpose. The cart corral was wholly

23

contained in a parking space. Driving a motorcycle through a cart corral is not the usual, ordinary, or customary way to use a cart corral. There is no evidence that the cart corral was dangerous or unsafe when used for the purpose for which it was intended as a stationary object located wholly outside the driving lane of the parking lot for the collection of shopping carts. By attempting to drive his motorcycle through the cart corral, Mr. Roberts used the cart corral for a purpose for which it had never been intended.

Plaintiffs argue that one of the purposes of the cart corral is to allow people, including motorcyclists, to safely pass through the cart corral when no horizontal bars are in place, but there is no such evidence of record. Plaintiffs cite Mid-South's deposition admission that a motorcycle *could* easily pass through such a cart corral. However, the fact that there was sufficient space for a motorcycle to pass through the cart corral does not mean that it was an intended or even anticipated purpose of the cart corral. A representative of Mid-South testified that Mid-South did not consider the possibility that someone would ride a motorcycle through the cart corrals. Plaintiffs also argue that it was foreseeable that a purpose of the cart corral was to have people, including motorcyclists, pass through because its design is based on a carport. However, the intended purpose of a carport is to pull a vehicle under the shelter and leave it there; it is not intended as a tunnel, drive through, or thoroughfare.

A product also may be defective because of a failure to warn of the dangers inherent in the product's use; the duty to warn consists of two duties: (1) to provide adequate instructions for safe use; and (2) to provide a warning as to dangers inherent in improper use. *Deaton*, 878 N.E.2d at 501 (citing *Coffman*, 815 N.E.2d at 527); *see also* Ind. Code § 34-20-4-2 (setting forth the standard for a defective product based on a failure to provide adequate warnings or instructions). Because Mr. Roberts' behavior was not a normal use or a reasonably foreseeable improper use as a matter of law,

Mid-South did not have a duty to warn against riding motorcycles through the cart corrals. *See Natural Gas Odorizing, Inc. v. Downs*, 685 N.E.2d 155, 162 (Ind. Ct. App. 1997) (recognizing that a manufacturer of a product has a duty to anticipate foreseeable uses of its product and has a duty to warn those persons it should reasonably foresee would be likely to use its product); *see also Leon v. Caterpillar Indus., Inc.*, 69 F.3d 1326, 1343 (7th. Cir. 1995) (recognizing that the duty to warn arises if a misuse is reasonably expected by the manufacturer or if the manufacturer knows that its product is being widely misused).

Accordingly, the Court grants Mid-South's motion for summary judgment.

## CONCLUSION

Based on the foregoing, the Court hereby (1) **GRANTS** the Motion of Menard, Inc. and Mid-South Metal Products, Inc. to Exclude Evidence and Testimony of Fereydoun Aghazadeh [DE 40]; (2) **GRANTS** the Motion for Summary Judgment of Menard, Inc. [DE 35]; (3) **GRANTS** the Motion for Summary Judgment of Mid-South Metal Products, Inc. [DE 38]; and (4) **DENIES as moot** the Motion for Oral Argument [DE 58].

SO ORDERED this 25th day of April, 2011.


 s/ Paul R. Cherry_____
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES MAGISTRATE JUDGE

cc:     All counsel of record